**08 CIV 6772.**

368-08/PJG/BGC
FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiff
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Peter J. Gutowski (PG 2200)
Barbara G. Carnevale (BC 1651)



RECEIVED
JUL 29 2008
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHELBY MARINE CORPORATION OF
PANAMA,

               Plaintiff

   -against-

PEGASUS DENIZCILIK A.S.,

              Defendant.

08 Civ. _____ ( ___ )

**VERIFIED COMPLAINT**

Plaintiff SHELBY MARINE CORPORATION OF PANAMA (hereinafter "SHELBY"),

for its Verified Complaint against Defendant PEGASUS DENIZCILIK A.S. (hereinafter

"PEGASUS") alleges upon information and belief as follows:

     1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract

of charter party. This case also falls under this Court's admiralty and maritime jurisdiction

pursuant to 28 U.S.C. §1333 and the Court's federal question jurisdiction pursuant to 28 U.S.C.

§1331 in that the action arises under the New York Convention on the Recognition and

Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201 *et seq.* and/or the Federal

Arbitration Act, 9 U.S.C. §1 *et seq.*

2.     At all times material hereto, Plaintiff SHELBY was and still is a business entity duly organized and existing under the laws of a foreign country with an address in Panama.

3.     At all times relevant hereto, Defendant PEGASUS was and still is a foreign business entity organized and existing under the laws of a foreign country with an address in Istanbul, Turkey.

4.     On or about September 27, 2004, Plaintiff SHELBY, in the capacity as owner of the M/V KRISSA, entered into a maritime contract of charter party with PEGASUS for a one time charter trip carrying steel products. A copy of the NYPE Charter Party dated September 27, 2004 is attached as Exhibit A.

5.     The vessel was duly tendered to Defendant PEGASUS, and Plaintiff SHELBY performed as required under the charter party.

6.     Following the redelivery of the vessel in Houston, Plaintiff SHELBY submitted its final hire statement to Defendant PEGASUS showing a balance due in Plaintiff SHELBY's favor in the amount of $80,082.87. A copy of Plaintiff SHELBY's final hire statement is attached as Exhibit B.

7.     In breach of the terms of the charter party, and despite due demand, Defendant PEGASUS has refused or otherwise failed to pay the amount due and outstanding and the amount of $80,082.87 remains due and owing.

8.     The charter party provides for the application of English law and any dispute arising thereunder is to be referred to arbitration in London, and Plaintiff SHELBY specifically reserves its right to arbitrate the substantive matters at issue. Arbitration has been commenced.

9.     This action is brought to obtain security in favor of Plaintiff SHELBY in respect to its claims against Defendant PEGASUS and in aid of London arbitration.

10.    Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs including attorneys' fees, arbitrators' fees, disbursements and interest are recoverable as part of Plaintiff's claim.

11.    This action is further brought to obtain security for the additional sums which are recoverable including Plaintiff's anticipated attorneys' and arbitrators' fees and costs in the London arbitration and interest, all of which are recoverable as part of Plaintiff's claim under English law.

12.    Plaintiff estimates, as nearly as can be computed, that the legal expenses and costs of prosecuting the claim in London arbitration will be $40,000, and interest on its damages are estimated to be $38,439.72 (calculated at the rate of 8% for a period of 6 years, which includes the period of time the debt has been outstanding plus the estimated time for completion of the proceedings in London).

### Request for Rule B Relief

13.    Upon information and belief, and after investigation, Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant PEGASUS DENIZCILIK A.S. (collectively hereinafter, "ASSETS"), including but not limited to ASSETS as may be held, received or transferred in its own name or as may be held, received or transferred for its benefit, at, moving through, or being transferred and/or wired to or from banking

institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

14.    The total amount to be attached pursuant to the calculations set forth above is $158,522.59.

WHEREFORE, Plaintiff SHELBY MARINE CORPORATION OF PANAMA prays:

a.    That process in due form of law according to the practice of this Court may issue against Defendant citing it to appear and answer the foregoing;

b.    That if Defendant cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendant up to and including $158,522.59 be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendant (collectively hereinafter, "ASSETS"), including but not limited to such ASSETS as may be held, received, or transferred in its own name or as may be held, received or transferred for its benefit, at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c.    That this Court retain jurisdiction over the matter for any subsequent enforcement action as may be necessary; and

d.    For such other, further and different relief, as the Court may deem just and proper in the premises.

DATED:      New York, New York
            July 29, 2008

                                FREEHILL HOGAN & MAHAR LLP
                                Attorneys for Plaintiff
                                SHELBY MARINE CORPORATION OF
                                PANAMA

                            By: _____
                                Peter J. Gutowski (PG 2200)
                                Barbara G. Carnevale (BC 1651)
                                80 Pine Street
                                New York, New York 10005
                                Tel: (212) 425-1900
                                Fax: (212) 425-1901

## ATTORNEY VERIFICATION

State of New York     )
                      ) ss.:
County of New York  )

PETER J. GUTOWSKI, being duly sworn, deposes and says as follows:

1.      I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3.      The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
                                    Peter J. Gutowski

Sworn to before me this
29th day of July, 2008

_____
Notary Public

HAZEL S. ROSENTHAL
Notary Public, State of New York
No. 01RO4641178
Qualified In Queens County
Certified In New York County
Commission Expires Dec. 31, 2010

# EXHIBIT A

# Time Charter

### GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1. This Charter Party, made and concluded in ............Istanbul.........................27th ...day of............September    .2004...... ...............................................
2. Between .......................Shelby Marine Corporation of Panama ..................... ..................................................................................................
3. Owners of the good.........PANAMA FLAG.........Steamship/Momrship.................M/V Krissa .........of ............................. .....................................................
4. of ...12765..........tons gross register, and ...7140.......... tons net register, having engines of.............indicated horse-power
5. and with hull, machinery and equipment in a thoroughly efficient state, and classed...American Bureau of Shipping ..........................................................
6. at...... of about...879,892.50......cubic meters deadweight or about...21000 MT .................................................... tons of 2240lbs.
7. deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,  all told
8. allowing a minimum of fifty tons) on a draft..9.97 ...foot- meters inches on .....Summer salt freeboard, inclusive of permanent bunkers,
9. which are of the capacity of about.......tons of fuel, and capable of steaming, throughout the period of the Charter Party fully laden under good weather
10. conditions about  13 knots on a consumption of ..............................about  23 Metric tons of  IFO (1000") .........best Welsh coal—best grade fuel oil—best grade Diesel Oil. (SEE CLAUSE 35 – VESSEL'S DESCRIPTION)
11. now(The  vessel  is  arriving  at  Skikda  on  4th  October  2004  PM  and  expect  to  stay  07/10  days  to  discharge  16,500mts  of  bulk maize.).......................................................................................................................................................................................................
12. ........................and......Pegasus Denizcilik A.S...................Charterers of the City of ................Istanbul, Turkey.......................................................
13. Witnesseth, That the, said  Owners agree to let, and  the said Charterers agree to hire the said vessel from  the time of delivery, for
14. about......... one time charter trip always via safe port(s),  safe  berth(s),  safe anchorage(s)  always afloat, always within Institute Warranty Limits  - with cargo steel products only– harmless, non dangerous and duration about 50/55 days without guarantee
15. .................................................................... within below mentioned trading limits.
16. Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining  responsible for
17. the fulfillment of this Charter Party.
18. Vessel to be placed at the disposal of the Charterers, at...on dropping last outward sea pilot in Skikda at any time day or night, Sundays and  Holidays included
19. Delivery/Redelivery to be made under GMT..........................(Vessel speed valid up to 4 beaufort sea state)............................................................
20. in such dock or at such safe wharf or safe place (where she may safely lie, always afloat, at all times  of  tide, except as otherwise provided in clause no 6) as
21. the Charterers may direct. If such dock, wharf or place be  not  available time to count as provided for in clause No. 3.  Vessel latest on her arrival first loading port delivery to be
22. ready to receive any permissible cargo with clean-swept washed down and dried up holds and tight, staunch, strong  and in  every way  fitted  for the ordinary cargo service, having water ballast, winches and
23. donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same
24. time (and with full complement of  officers, seamen,  engineers and firemen for a vessel of her tonnage), to be employed in carrying general lawful merchan-
25. dise, including petroleum or its products, in proper containers, excluding..... ...(See Clause 44 – Cargo Exclusion)...................................................................
26. (Vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,
27. all necessary fittings and other requirement to be for account of Charterers), in such lawful trades, between safe port  and/or ports in British North
28. America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean  Sea, and/or Gulf of Mexico, and/or ............................................................................................ ......................and/or Europe
29. Mexico, and/or South America.
30. and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magadlena River, River St. Lawrence between
31. October  31st and May  15th,  Hudson  Bay  and  all  unsafe  ports,  also excluding   when  out  of  season, White  Sea,  Black  Sea  and  the  Baltic,
32. World-wide trading always within Institute Warranty Limits excluding all unsafe ports and Trading Exclusions.
33. (Also see clause 82).
34. .........................................................................................................................................................................................
35. as the Charterers or their Agents shall direct, on the following conditions:
36. 1. That whilst on hire the Owners shall provide and pay for all provisions, fresh water, wages and consular shipping and discharging fees of the Crew; also charges for port services pertaining to the crew shall pay for the
37. insurance of the vessel, also for all the cabin, deck, engine-room  and other necessary  stores, including boiler water, drinking water / lubricating oil and maintain her mass and keep
38. the vessel in a thoroughly efficient state  in hull,  machinery and equipment with all customary certificates necessary to comply with requirements at ports of call and canals for and during the service.
39. 2. That whilst on hire the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, including for all river and canal dues / tolls charges, expenses and also all charges pertaining to cargo and any taxes on cargo and/or freight, customary and compulsory Pilotages, including pilots for Straits of Malacca / Bosphorus (pilot Danish Straits between Spoedsberg and Grenaa pilot stations, if required by Master, to be for Charterers' account), Agencies, Commissions, Canal and River Tolls, Fairway dues in Finland, if any to be for Charterers' account, customs clearance, boatage on Charterers business,
40. Consular Charges (except those pertaining to the Crew / flag), and all other usual expenses except those before stated, but when the vessel puts into
41. a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners  Fumigations ordered because of
42. illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or port visited while vessel is employed under this
43. charter to be for Charterers account. All other Fumigations to be for Charterers account after vessel has been on hire for a continuous period.


ORIGINAL

44. Of six months or more,

45. Charterers are to provide necessary dunnage (shippers to submit to master fito-sanitary certificate of dunnage, issued by local authority,prior departure failing which charterers will remain responsible for any consequences USA authority fines) and shifting boards and materials, also any extra fittings requisite for a special trade or unusual cargo, but

46. Owners to allow them the use of any dunnage and shifting boards already aboard vessel, Charterers to have the privilege of using shifting boards

47. for dunnage, thus making good any damage thereto.

48. 3. That the Charterers, at the port of delivery, and the Owners, at the port of redelivery, shall take over and pay for all fuel remaining on

49. board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than............tons and not more than

50. ..........................tons and to be re-delivered with not less than..................tons and not more than..................tons. (See Clause 45)

51. 4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of ..... US$ 12,000   per day / pro rata including overtime payable United States Currency every 15 days in advance and first hire to be paid together with bunkers on delivery value .............................................in United States Currency per ton on vessel's total

52. deadweight-carrying-capacity, including bunkers and

53. stores, etc.... summer freeboard, per Calendar Month, commencing on and from the day and time of her delivery, as aforesaid, and at

54. and after the same rate for any part of a  day month;  hire to continue  until the hour of  the day of  her  redelivery in like good  order  and condition, ordinary

55. wear and tear excepted, to the Owners (unless lost) at.... on dropping  last  outward sea pilot in one safe port in US Gulf - port in charterer's option (charterer's intention is Houston)

56. anytime day, night, Sundays and holidays included unless otherwise mutually agreed. Charterers are to give Owners not less than ...20 and 15... days

57. notice of vessel's expected date of re-delivery, and probable port, followed by 10/7/5/3/1 days definite notice of redelivery date and port.

58. 5. Payment of said hire to be made as per Clause 51 in New-York in cash in United States Currency, semi-monthly every 15 days in advance, and  for  the last half  month or

59. part of same the approximate amount of hire, and should same not cover the actual time, hire is to be  paid for the balance day by day, as it becomes

60. due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61. hire, or bank guarantee, or on any breach of  this Charter Party, the Owners shall be at  liberty to withdraw the vessel from the service of the Char-

62. terers, without prejudice to any claim they  (the Owners)  may  otherwise have on the Charterers. On delivery, first hire and value of remaining bunkers on board to be paid to owner's nominated bank account on the same day of vessel's delivery to charterers subject to bank working hours or next banking day latest.  (See Clause 45 – Bunkers Clause) Time to count from 7 a.m. on the working day

63. following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m. but if required by Charterers,  they

64. to have the privilege of using vessel at once, such time used to count as hire.

65. Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, and approved by Owners by the Charterers of their Agents, subject

66. to 2½% commission and such advances to be deducted from the hire. The Charterers, however,  shall in  no way be  responsible  for the application

67. of such advances.

68. 6. That the cargo or cargoes be laden and / or discharged in any safe dock or at any safe wharf or safe place that Charterers or their Agents may

69. direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely

70. lie aground.

71. 7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also

72. accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73. tackle,  apparel,  furniture,  provisions, stores and  fuel. No passengers allowed. Charterers  have  the  privilege  of  passengers as  far as  accommodation  allow, Charterers

74. paying Owners ...per day per passenger for accommodation and meals. However, it is agreed that in case any fines or extra expenses are

75. incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.

76. 8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77. boats equipment. The Captain (although appointed by the Owners), shall be under the orders  and directions of the Charterers  as  regards vessel's employment

78. and agency; and Charterers are to load, stow/unstow, lash, unlash, secure, dunnage, tally and discharge trim, the cargo to master's satisfaction at their expense under the supervision of Captain, who is to sign Bills of Lading for

79. cargo as presented, in conformity with Mate's or Tally-Clerk's receipts endorsed by chief mate on board. (See Clause 42)

80. 9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81. receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82. 10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel at charterers' risk responsibility and expense and see that voyages are prosecuted

83. with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84. rate of USD 10.00 $1.00 per day Owners  to victual  Pilots and  Customs Officers, and also,  when authorized  by  Charterers or their Agents, to victual Tally,

85. Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling. (See Clause No.66)

86. 11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87. Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

88. terers, their Agents or  Supercargo, when required, with a true copy of daily Logs, showing the course of  the vessel and distance run and the con-

89. sumption of fuel.

90. 12. That the Captain shall use diligence in caring for the ventilation of the cargo after receiving instructions from charterers.



ORIGINAL

91.    13. That the Charterers shall have the option of continuing this charter for a further period of .................................................................................

92.    ..........................................................................................................................................................................................................................

93.    on giving written notice thereof to the Owners or their Agent........days previous to the expiration of the first named term, or any declared option.

94.    14. That if required by Charterers, time not to commence before 10th October 2004 ....................and should vessel

95.    not have given written notice of readiness on or before..17th October 2004 – 2400 hours local time – at any time day or night, Sundays and Holidays included..............but not later than 1 p.m. Charterers or

96.    their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. Delivery/redelivery time and lay-cancelling to be based on GMT.

97.    15. That in the event of the loss of time from deficiency and/or default of men or deficient stores, fire, breakdown or damages to hull, machinery or equipment, unless such (defect or breakdown) deficiency, default, breakdown or damage caused by Charterers and/or Charterers' servants and/or Charterers' agents and/or their servants,

98.    grounding , detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause whatsoever

99.    preventing the full working of the vessel, unless caused by Charterers / Shippers / Receivers or their servants and agents the payment of hire shall cease for the time thereby lost: and if upon the voyage the speed be reduced by

100.    defect in or breakdown of any part of her hull, machinery or equipment, unless such (defect or breakdown) deficiency, default, breakdown or damage caused by Charterers and/or Charterers servants and/or Charterers agents the time so lust, and the cost of any extra fuel consumed in consequence

101.    thereof, and all extra expenses shall be deducted from the hire. Bunker savings in case of under speed deficiency. If any, may be off-set against time lost enroute.

102.    16.That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103.    returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

.04.    Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

05.    The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessel's in distress, and to deviate for the

106.    purpose of saving life and property.

107.    17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons in London at New York In accordance with Arbitration Act 1996 and LMAA Terms and Conditions.

108.    one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them. shall be final, and for

109.    the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial shipping men who shall be members of LMAA and conversant with shipping matters. This charter party to be governed by and construed in accordance with English Law.

110.    18. That the Owners shall have a lien upon all cargoes, and all sub time-charter hire, freight and all any amounts due under this Charter, including General Aver-

111.    age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112.    deposit to be returned at once, Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

113.    might have priority over the title and interest of the owners in the vessel.

114.    19.That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

115.    Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of

116.    York-Antwerp Rules 1994 and subsequent amendments, if any, in London 1924, at such port or place in the United States as may be selected by the carrier, and as to matters not provided for by these

117.    Rules, according to the laws and usages at the port of New-York, in such adjustment disbursements in foreign currencies shall be exchanged into

118.    United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at

119.    the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or

120.    bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier

121.    or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if

122.    required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the

123.    carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the

124.    place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in

125.    United States money.

126.    In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,

127.    whether due to negligence or not, for which, or for the consequence of which the carrier is not responsible, by statute, contract, or otherwise, the

128.    goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,

129.    losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the

130.    goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or

131.    ships belonged to strangers. Hire not to contribute to General Average.

132.    Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

133.    20.Fuel used by the vessel while off hire, also for cooking, condensing water, or for galtes and stoves to be agreed to as to quantity, and the

134.    cost of replacing same, to be allowed by Owners.

135.    21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a

136.    convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from

137.    end of last painting, and payment of the hire to be suspended until she is again in proper state for the service.

138.    Drydocking to be done only in case of emergency..............................................................................................................................................................

139.    ..........................................................................................................................................................................................................................

ORIGINAL

140.    22. Owners shall maintain the gear of the ship as fitted, providing gear (for all cranes derricks) capable of handling lifts up to three tons, also

141.    providing ropes, falls, slings and blocks as on board. If vessel is fitted with cranes derricks capable of handling heavier lifts, Owners are to provide necessary gear for

142.    same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also   to provide on the vessel lanterns and all for

143.    night work, and vessel to give use of electric light sufficient for night work as on board when so fixed, but any additional lights over those on board to be at Charterers'

        expense. The

144.    Charterers to have the use of any gear on board the vessel.

145.    23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging,

146.    steamer to provide one winchman per hatch to work winches day and night, as required. Charterers agreeing to pay officers, engineers, winchmen,

147.    deck hands and donkeyman for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the

148.    port  or labor  unions,  prevent  crew  from  driving  winches,  shore  Winchmen  to  be  paid  by  Charterers.  In  the  event  of  a  disabled  winch

        or winches, or

149.    insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned

150.    thereby. Experienced shore cranemen to be employed and paid by Charterers.

151.    24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained

152.    in the Act of Congress of the United States approved on the 13th day of February, 1853, and entitled "An Act relating to Navigation of Vessels;

153.    etc., " in respect of  all cargo shipped under this charter to or from the United States of America. It is further subject to the following  clauses, both

154.    of which are to be included in all bills of lading issued hereunder;

155.                                                           U.S.A. Clause Paramount

156.    This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April

157.    16,1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of

158.    any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading

159.    be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

160.                                                           Both to Blame Collision Clause

161.    If the ship comes into collision with another ship as a result of the negligence of the other ship and any act neglect or default of the

162.    Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried

163.    hereunder will indemnify the Carrier against all loss or liability to the other sea-carrying ship  or  her owners in so far as such loss

164.    or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non

165.    carrying ship or her owners to the  owners of said goods and set off, recouped or recovered by the other or non carrying ship or her

166.    owners as part of their claim against the carrying ship or carrier.

167.    25. The vessel shall not be required to enter any icebound port, or any port where lights or lightships have been or are about to be with-

168.    drawn  by reason of  ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the

169.    port or to get out after having completed loading or discharging.

170.    26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The  owners to remain responsible for the

171.    navigation of  the vessel, acts of pilot and tugboats, insurance, crew, and all other  matters, same as when trading for their own account.

172.    27. A commission of 1.25 2-1/2 per cent is payable by the Vessel and Owners to " M AND F CHARTERING SA PIRAEUS GREECE " and a commission of

        1.25 per cent is payable by Charterers to "Efe Denizcilik Sanayi Ve Ticaret Ltd.Sti (EFE CHARTERING) İstanbul"   +1  25% to Nicholas G.

173.    on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.   Moundreas Shipping S A

174.    28. An address commission of 2 ¼ 2.50 per cent payable to CHARTERERS on the hire earned and paid under this Charter.

Clauses 29 to 108 inclusive, together with "CONWARTIME 1993", "BOTH TO BLAME COLLISION", "NEW JASON ", "GENERAL CLAUSE PARAMOUNT",
" BIMCO STOWAWAY CLAUSE FOR TIME CHARTERS" CLAUSES AND  "Owners' reply to charterers' questionnaire" are to be fully incorporated in this
Charter Party.

OWNERS                                                      CHARTERERS



*ADDITIONAL CLAUSES OF " 'MV KRISSA' CHARTER PARTY BETWEEN*
*'PEGASUS DENIZCILIK A.S. ISTANBUL' & 'SHELBY MARINE CORPORATION*
*PANAMA' PLACE AND DATE: ISTANBUL , 27TH SEPTEMBER 2004 "*

Clause 29

Owners shall have the liberty of using diesel oil for manoeuvring in and out of ports and in narrow, shallow, congested waters and channels, but Master and Owners to co-operate with Charterers to minimize consumption.

Clause 30

With reference to Clause 15, should the vessel put back whilst on a voyage by reason of an accident and breakdown, the hire shall be suspended prorata from the time of her putting back until she is again in the same position and/or distance and voyage resumed therefrom and all extra expenses incurred by vessel including bunkers consumed during period of suspended hire to be for Owners' account.

Clause 31

Owners to supply valid Deratisation Certificate on vessel's delivery and if such certificate does not cover the whole period of this Charter, the cost of same and detention thereof in case fumigation is necessary to be for Owners' account. Fumigation of cargo, if any, shall be for Charterers' account.

Clause 32

Deleted.

Clause 33

Basic war risk insurance premium for trading as per vessel's insurance policies to be for Owners' account. Additional premiums for hull and machinery and Officers / crew and crew war bonus, if any, to be for Charterers' account.

Clause 34

Stevedores to be appointed and paid by Charterers but to work under the supervision of the Master. Should any damage be caused to the vessel or her fittings by the stevedores, the Master has to try to let stevedores repair such damage and try to settle the matter directly with them, however Charterers remain ultimately responsible for stevedores damage. The Charterers shall not be responsible for any damage caused by stevedores to the vessel unless the Master immediately notifies the Charterers or their agents of such damage within 48 hours from the occurrence or in the case of hidden damages same to be reported latest to Charterers prior to redelivery of the vessel.

The Charterers shall have the liberty to redeliver the vessel without repairing the damage for which the Charterers are responsible, as long as same does not affect seaworthiness / cargo-worthiness, but the Charterers undertake to reimburse cost of repair estimation against production of repair bills of repairers or dockyard or joint off-hire surveyor unless otherwise agreed. Damages causing unsea/cargo-worthiness of the vessel to be repaired immediately at Charterers' time prior to redelivery of the vessel.

Clause 35                    Description

M/V KRISSA
- SELF TRIMMING BULKCARRIER
- BUILT 8/1979
- CLASS ABS
- PANAMA FLAG
- DWAT ABT 21,000 MT ON 9.97M SDRAFT
- ENG/BRIDGE AFT
- LOA/BEAM: 158.80/22.60M

_ADDITIONAL CLAUSES OF " MV KRISSA' CHARTER PARTY BETWEEN
'PEGASUS DENIZCILIK A.S. ISTANBUL' & 'SHELBY MARINE CORPORATION
PANAMA' PLACE AND DATE: ISTANBUL , 27TH SEPTEMBER 2004 "_

- GRAIN/BALE: 878,892.50/813,265.70 CFT (INCLUDING HATCHCOAMINGS)
- 4 HO/HA
- HATCH SIZES: 16.8-18.4-18.4-18.4 M ALL BY 11.20 M
- FOLDING MACGREGOR TYPE HATCHCOVERS
- SWINGING TYPE DERRICKS 4X30 TONS EACH
- ENGINE MITSUBISHI 10,000 BHP
- SPEED/CONSUMPTION UNDER GOOD WEATHER CONDITIONS:
ABT 13 KN ON ABT 23 MT IFO 1000" + ABT 2 MT MDO
OR ABT 14 KN ON ABT 26 MT IFO 1000" + ABT 2 MT MDO
- IN NARROW WATERS SUCH AS RIVERS, CANALS, ETC OR WHEN MANOEUVRING
IN PORTS VSL CONSUMES MDO IN THE MAIN ENGINE
- ELECTRICALLY VENTILATED HOLDS - CO2 FITTED - GRAIN FITTED
- STRENGTHS: HOLDS TANK TOP 11 TNS/M2
HATCHES 2.2-2.7 TNS/M2
- CONSUMPTION AT PORT (IDLE) : ABT 2 MT MDO PER 24HRS
CONSUMPTION AT PORT (WHEN WINCHES ARE WORKING) : ABT 5 MTS MDO PER 24 HRS //
ABT 2 MTS MDO PER 08 HRS
ALL DTLS ABT

- registered owners' / managers' full styles: SHELBY MARINE CORP PANAMA / GOOD FAITH
SHIPPING CO. S.A. PIRAEUS / GREECE
- vessel's pandi club and class full names: THE AMERICAN CLUB / AMERICAN BUREAU OF
SHIPPING
- vessel's present itienary + next discharge port agents fstyle: THE VSL IS ARRIVING AT SKIKDA 4TH
OCTOBER 2004 PM AND EXPECT TO STAY 7/10 DAYS TO DISCHARGE 16.500 MT OF BLK
MAIZE)

owners warrant followings to remain same throughout whole chaterparty period:
- vessel is classed lloyds 100 a1 or equal (member of iasc) and pandi covered
- vessel's all hatches are water-tight
- vessel's main holds and hatches are clear unobstructed and in all respect suitable for the loading, safe
carriage and discharging of intended steel/steel products cargoes
- vessel's main holds are steel floored
- vessel is fully ism and fully isps certified

Clause 36

General Clause Paramount, New Jason Clause, Both-to-Blame Collision Clause, Conwartime 1993 (as
attached) Chamber of Shipping Nuclear Clause to apply and form part of this Charter Party.

Clause 37

Owners to guarantee that vessel is in possession of valid and approved Cargo gear Certificate in
compliance with American Cargo Gear regulations and current requirements of all ports of call during the
currency of this Charter. Any time lost and/or expenses involved by not having or in obtaining such a valid
or approved certificate to be for Owners' account.

Clause 38

Charterers have the right to deduct from the last and/or penultimate payment of hire if last payment is
insufficient USD 500.00 per port of Owners' disbursement and estimated cost of bunkers on redelivery.

Charterers to endeavour to settle Owners' disbursement within 2 months after vessel's redelivery.
Charterers are not entitled to deduct USD 500.00 at ports where Owners appointing their own agents.

2

*ADDITIONAL CLAUSES OF " 'MV KRISSA' CHARTER PARTY BETWEEN 'PEGASUS DENIZCILIK A.S. ISTANBUL' & 'SHELBY MARINE CORPORATION PANAMA' PLACE AND DATE: ISTANBUL , 27TH SEPTEMBER 2004 "*

Clause 39

Vessel to be in possession of the necessary certificates to comply with safety and health regulations including cargo gear and current requirements at all ports of call during the currency of this Charter. The Master, Officers and crew of the vessel hold vaccination certificates required at ports of call intended during this Charter Party.

Clause 40

Charterers to have the option of redelivering the vessel without cleaning holds paying lumpsum USD 5,000 in lieu of hold cleaning including all removal and disposal of dunnage / lashing materials and debris.

Clause 41

Owners have the right to appoint Owners' agents to attend to all Owners' matters, such as delivery, redelivery, General Average, drydocking, hospitalisation, repatriation of crew, repair supply of vessel's stores and provisions etc. However, Charterers allow Master to use Charterers' Agents at various ports to handle simple matters such as mailing and sending of correspondence and telegram/telex etc., without charging any fees except actual expenses.

Clause 42

Notwithstanding the provisions of Clause 8, Master and Owners authorise the Charterers, Sub-Charterers or agents to sign Bills of Lading in exact accordance with Mate's receipts endorsed by Chief Mate on board, for and on behalf of Master if so required by Charterers. Bs/l marked 'clean on board' Master has right to refuse any rusty/damaged cargo. Charterers to replace same with clean/sound cargo.

Clause 43

Watchmen for the vessel to be performed by the crew. Watchmen for cargo and compulsory watchmen to be for Owners' account .

Clause 44        -        Cargo

Only steel and steel products – harmless and non dangerous are allowed.

Clause 45        -        Bunkers

Bunkers on board on delivery to be about 600 tons ifo and about 150 tns mdo. Vessel is to be redelivered with about the same quantities as on board on delivery. Charterers are to pay value of bunkers on board on delivery together with the first hire payment. Charterers have the right to deduct value of redelivery bunkers from last sufficient hire payment.
However bunker quantities on board on delivery to be confirmed by owners latest by 02 October 2004. Bunker prices at both ends to be usd 200 per metric ton for ifo and usd 350 per metric ton for mdo,

Clause 46

In the event of detention of the vessel by oil or any other substance, pollution alleged by any Government Department and also any similar legislation except such event is caused by Charterers or their servants or agents, vessel to be put off-hire until vessel resumes the voyage and Owners indemnify Charterers against all claims, liabilities, costs and all consequences relating to those which Owners are legally responsible for.

If the Owners are required or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters or any other country or state in performance of this Charter Party, the Owners shall make all the

ORIGINAL

### ADDITIONAL CLAUSES OF " 'MV KRISSA' CHARTER PARTY BETWEEN 'PEGASUS DENIZCILIK A.S. ISTANBUL' & 'SHELBY MARINE CORPORATION PANAMA' PLACE AND DATE: ISTANBUL , 27TH SEPTEMBER 2004 "

arrangements as may be necessitated to satisfy such requirements at Owners' sole expense but only to the extent that can be satisfied by producing vessel's valid P and I Club entry certificate.

Clause 47

Owners to guarantee that vessel and/or Management have not called at a Cuban port and will not call at any such port prior to or during the currency of this Charter.

Clause 48

In the event of loss of time or deviation from the course of the voyage caused by stowaway, refugee, salvage or any person on board the vessel and/or sickness of or accident to the Master / Officers, crew and/or strike by the Master / Officers, crew, the hire to be suspended from the time of inefficiency or deviation in port or at sea until vessel is again efficient in the same position and/or distance to resume the voyage. All expenses directly incurred including bunkers consumed during such period of suspension to be for Owners' account.

Clause 49

Should the vessel be seized or detained or arrested or delayed by any authority or by any legal process, hire to be suspended from the time of her seizure or detention or arrest until the time of her release unless such seizure or detention or arrest / delay is occasioned by any personal act or omission or default of the Charterers or their agents or their servants.

Any extra expenses incurred by and/or during the above seizure or detention or arrest or delay to be for Owners' account unless caused by Charterers or their agents or their servants.

Clause 50

In the event of a breakdown of a crane or cranes by reason of disablement or insufficient power, the hire to be reduced pro rata for the period of such inefficiency in relation to the number of hatches available. Any extra costs of hiring shore cranes / gear including stevedores stand-by time, if any but limited to the next working shift, incurred by such crane trouble to be for Owners' account, however, hire to be continued if shore crane / gear is substituted. Stand-by time for stevedores during crane breakdown to be limited to balance of working shift, if such breakdown is a direct result of improper handling of cranes by shore Shippers / Receivers / Charterers' of shore crane driver unprofessional attitude and same to immediately intervene to rectify.

Clause 51

The owners guarantee that the vessel will comply in the United States of America, its territories and possessions with all U.S. Coast Guard Regulations and if owners fail to do so all consequences resulting from such a failure to be for Owners' account and vessel to be off-hire.

Clause 52

Normal quarantine time and expenses to enter the port to be for Charterers' account, but any time of detention and expenses for quarantine due to pestilence, illness, etc., of Master, Officers and crew to be for Owners' account. Vessel to prepare for passing radio pratique where permitted.

Clause 53

Liabilities for cargo claims shall be borne by Owners / Time Charterers in accordance with the Interclub New York Produce Exchange agreement September 1996.

4

*ADDITIONAL CLAUSES OF " 'MV KRISSA' CHARTER PARTY BETWEEN
'PEGASUS DENIZCILIK A.S. ISTANBUL' & 'SHELBY MARINE CORPORATION
PANAMA' PLACE AND DATE: ISTANBUL , 27TH SEPTEMBER 2004 "*

<u>Clause 54</u>

Owners confirm vessel is fully covered by P. and I. Club. Charterers have the benefit of Owners granted by the P. & I. Club in so far as the Club's rules permit.

<u>Clause 55</u>

Deleted.

<u>Clause 56</u>

The vessel to be fully fitted with hatch covers complete and in good order on all hatches. If local requirements permit, opening and closing of hatches to be accomplished by the Crew free of costs to Charterers.

<u>Clause 57</u>

If hire is due and not received by the Owners before exercising the option of withdrawing the vessel from the Charter, Owners will give Charterers 48 hours notice, Saturdays, Sundays and holidays excluded and will not withdraw the vessel if the hire is paid within these 48 hours.

<u>Clause 58</u>

Deleted.

<u>Clause 59</u>

Deleted.

<u>Clause 60</u>

Deleted.

<u>Clause 61</u>        <u>Owners Bankers</u>

    ABN AMRO BANK N.V.,
    PIRAEUS BRANCH,
    AKTI MIAOULI 93
    PIRAEUS 185 10
    GREECE
    IN FAVOUR OF GOOD FAITH SHIPPING CO. S.A.
    ACCOUNT NO. 50.83.40.209
    SWIFT CODE ABNAGRAP
    FOR M/V "KRISSA" C/P DD. ....
    IBAN NO: GR09 0601 0950 0000 00508340209

<u>Clause 62</u>

Deleted.

<u>Clause 63</u>

Any taxes and/or dues of any kind on the vessel and/or Bill of Lading, freight and/or cargo, levied by the government of any territory to which the ship trades, is to be for Charterers' account. Any taxes on Charter

*ADDITIONAL CLAUSES OF " 'MV KRISSA' CHARTER PARTY BETWEEN
'PEGASUS DENIZCILIK A.S. ISTANBUL' & 'SHELBY MARINE CORPORATION
PANAMA' PLACE AND DATE: ISTANBUL, 27TH SEPTEMBER 2004 "*

hire of this Charter Party imposed by the government of the vessel's flag / domicile of vessel's owners, will be for Owners' account.

Clause 64

No dry docking to be carried out during this Charter unless in case of emergency.

Clause 65

Owners to guarantee that the vessel's gear can lift unit loads upto their described capacity when operated.

Clause 66

Charterers to pay US$ 1100    -- per month or pro rata for all cables / victualling / entertainment charges to owners.

Clause 67

Should the vessel be boycotted, picketed, blacklisted or similar incident at any port or place by shore and/or port labours and/or tugboats and/or pilots or by Government and/or any authority by reason of the vessel's flag / registry / manning or Ownership or terms and conditions on which members of the Officers / crew are employed, or by reason of trading of this vessel or other vessel under the same Ownership, management, operation or control or by reason of the vessel's construction and/or fittings and/or her equipment, all consequences and any extra expenses incurred therefrom to be for Owners' account and the Charterers are entitled to place the vessel off-hire for any time lost by such reasons.

Clause 68

Deleted – No deck cargo.

Clause 69

Should Bill(s) of Lading not arrive at discharge port(s) in time, then Charterers may request Owners to release cargo without presenting original Bills of Lading and Charterers hereby state that they shall indemnify Owners against all consequences arising from Owners conforming to Charterers' request in releasing cargo without original Bills of Lading. Charterers are to issue single Letter of Indemnity to Owners in accordance with P. & I. Club wording, and the original Letter of Indemnity is to be forwarded to Owners and copy of Letter of Indemnity to be presented to Master on arrival by Charterers' agents.

Clause 70

The Owners guarantee that the vessel is eligible for bunkers in the United States of America, its territories and possessions in accordance with U.S. Coast Guard Regulations set forth in Title 33 Chapter 1 Sub-Charter C part 135 and 156 Code of Federal Regulations. The owners also guarantee that the vessel is eligible for bunkers in any other country provided no commingling unless proper regulations approved by owners.

Clause 71

Should the vessel be placed off-hire for more than 10 consecutive days, the Charterers have the right to cancel the balance period of this Charter by giving notice to the Owners without prejudice to any other right the Charterers may have under this Charter. However, Charterers are not allowed to cancel the Charter if there is any cargo lying on board the vessel.

*ADDITIONAL CLAUSES OF " 'MV KRISSA' CHARTER PARTY BETWEEN 'PEGASUS DENIZCILIK A.S. ISTANBUL' & 'SHELBY MARINE CORPORATION PANAMA' PLACE AND DATE: ISTANBUL, 27TH SEPTEMBER 2004 "*

Clause 72

Owners are to give notice of fixing and then 24 hours approximate notice and to keep Charterers informed of vessel's movements.

Clause 73

Any delay, expenses and/or fine incurred on account of smuggling should be for Owners' account if caused by the Officers and/or crew, or shall be for Charterers' account if caused by the Charterers' supercargo and/or their staff or agents or their employees / servants.

Clause 74

Owners guarantee that from 1st April 1998 the carrying vessel fully complies with the ISM Code having a "Safety Management System" in operation.

As from 1st July Owners further confirm that the carrying vessel will be in possession of a valid "Safety Management Certificate" and a valid "Document of Compliance" and such documents will remain valid for the entirety of her employment under this Charter Party.

Owners to provide Charterers with satisfactory evidence of compliance if required to do so and to remain fully responsible for all and any losses, claims or consequences, howsoever arising directly or indirectly due to non-compliance with the above.

Clause 75

The Owners guarantee that the vessel's Officers and crew on board are employed under the Bonafide Agreement acceptable to the ITF during the whole Charter Party.

Clause 76

Holds conditions upon arrival at first loading port the holds to be clean swept in every respect ready to load the cargo as per government / local independent inspector. If vessel fails holds inspection, vessel shall be off-hire from the time of rejection until all holds have passed inspection and Master / crew shall commence hold cleaning without delay in order to meet inspectors requirements.

Clause 77

Deleted.

Clause 78        U.S. Trade – Unique Bill of Lading Identifier Clause

The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the United States of America shall have to be endorsed with a Unique Bill of Lading Identifier as required by the U.S. Customs regulations (19 CRF Part 4 Section 4, 7A) including subsequent changes, amendments or modifications thereto, not later than the first port of call. Non-compliance with the provisions of this clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.

Clause 79

The Charterers shall warrant to exercise due care and diligence in preventing stowaways in getting access to the vessel by means of secreting away in the goods shipped by the Charterers.

_ADDITIONAL CLAUSES OF " 'MV KRISSA' CHARTER PARTY BETWEEN_
_'PEGASUS DENIZCILIK A.S. ISTANBUL' & 'SHELBY MARINE CORPORATION_
_PANAMA' PLACE AND DATE: ISTANBUL , 27TH SEPTEMBER 2004 "_

Clause 80

It is agreed that the vessel may be lightened into barge(s) at any safe anchorage and/or safe berth as ordered by the Charterers but always subject to Master's absolute discretion whether such lightening / discharging is safe and feasible.

The Master may, if he considers it at any time unsafe to commence or continue lightening, order the barge(s) away from his vessel to a safe distance and such barge(s) must obey such orders. Charterers shall supply adequate and proper fenders or rubber tyres and securing equipment acceptable to the Master, failing which the Master may refuse to discharge into lighters and vessel to remain on-hire and is not to be responsible in anyway, and Charterers also shall be liable for any damage caused to the vessel by the barge(s) during arrivals, sailings, securing, lying alongside, un-securing or departure of the barge(s) provided the Master has sustained such damage by holding liable in writing the party responsible. Master shall at all times give full co-operation to the Charterers and/or their agents to expedite discharge and best endeavours to take all responsible steps to protect his vessel from sustaining damage.

If the Master at any time considers it unsafe to continue lightening then he has the right to remove his vessel and/or barge away from his vessel until he considers it safe to resume lightening and vessel is always to remain on-hire during such period. All Master's actions have to be reasonable and in accordance with normal seamanship. Any extra insurance for lightening / double-banking, if any, to be for Charterers' account.

Clause 81

Crew to re-lash cargo only in case of emergency at sea.

Charterers shall pay a compensation for such extra work which to be agreed between Master and Charterers subject to availability of crew members, but Owners shall not be responsible for any unprofessional result of same and any damages thereafter shall be for Charterers' account.

Clause 82

Deleted.

Clause 83

Replenishment of bunkers is agreed and paid for by the Charterers but always under the supervision of the Master. The Master shall pay due diligence for replenishment of bunkers so as not to cause oil spillage while bunkering.

Clause 84

The Charterers shall have the option of holding a superficial inspection prior to delivery and also at any time of this Charter. The Owners and Master shall give every facility and assistance.

Clause 85

If major war breaks out between any two or more of the following countries:

France, Italy, Germany, United Kingdom, U.S.A., Russia, People's Republic of China, turkey, Japan, Norway directly affecting the performance of this Charter, both Owners and Charterers shall have the option of canceling this Charter whereupon the Charterers shall redeliver the vessel to the Owners. If she has cargo on board, after discharge thereof at destination or if debarred from reaching or entering it, at a near open and safe port as directed by the Charterers. In all cases, hire shall be paid until the vessel's redelivery.

*ADDITIONAL CLAUSES OF " 'MV KRISSA' CHARTER PARTY BETWEEN*
*'PEGASUS DENIZCILIK A.S. ISTANBUL' & 'SHELBY MARINE CORPORATION*
*PANAMA' PLACE AND DATE: ISTANBUL , 27TH SEPTEMBER 2004 "*

Clause 86

Should the political social and/or other situation change to the extent not to effect the vessel's trading to the excluded countries, the Charterers shall be allowed to make the vessel trade to such countries subject to the Owners' consent which shall not be unreasonably withheld.

Clause 87

Deleted.

Clause 88

Deleted.

Clause 89

The owners guarantee that the vessel is not categorized as "high risk vessel" and/or "low risk vessel" defined by the Canadian and/or U.S. Government(s) regarding Asian Gypsy Moth Plan Protection Policy.

The Owners warrant that the vessel, excepted all ports deemed Asian Gypsy Moth infested, when called upon at Charterers' request (such as Siberian ports) and in such case loss and damage to be for Charterers' account, is free of any infestation by the Asian Gypsy Moth or its eggs.

Should the Owners fail to fulfil their warranty as above, the Owners shall indemnify the Charterers from any loss or damage sustained by the Charterers and all consequences arising from / in connection with such failure, including but not limited to any delay,

expenses, fines, cost for removal of such moth or its eggs and/or even transshipment of cargo on board, regardless of whether or not the vessel would be banned from entering into or order to leave the Canadian and/or U.S. waters / ports because of said failure.

Clause 90

Should the vessel be requisitioned by the Government of the vessel's flag, during the period of this Charter, the vessel shall be deemed to be off-hire during the period of such requisition and any hire paid by the said Government in respect of such requisition period shall be retained by the Owners, however, the Charterers shall have the option to cancel the balance period of this Charter.

Clause 91

The vessel has natural ventilation only.

Clause 92        Trading Exclusions

ONLY 'TURKEY' AND 'UNITED STATES OF AMERICA' ARE ALLOWED FOR THE VESSEL TO TRADE.



*ADDITIONAL CLAUSES OF " 'MV KRISSA' CHARTER PARTY BETWEEN
'PEGASUS DENIZCILIK A.S. ISTANBUL' & 'SHELBY MARINE CORPORATION
PANAMA' PLACE AND DATE: ISTANBUL , 27TH SEPTEMBER 2004 "*

Clause 93

No deduction to be made for domestic fuel consumption.

Clause 94

Owners confirm that the vessel is not listed on USCG list due to:

    a) Flag
    b) Ownership
    c) Classification
    d) Vessel's boarding history
    e) Outstanding items found by USCG during earlier inspections

In case vessel is detained by any U.S. Authority due to above reasons or new incidents involving U.S. Authorities, Owners are responsible for any additional expenses involved in having cargo delivered to Receivers without delay.

Clause 95    Vessel's Performance

Vessel's performance will be monitored by an independent routing company in Charterers' option and at Charterers' expense, and if vessel's performance should fall short of speed warranty as per Description Clause, Charterers have the right to adjust hire and bunkers accordingly provided such adjustments are fully substantiated by an independent routing company. An independent routing company will prior to vessel's departure from port, give the Master a recommended route to the next port of call and will make further recommendations during the voyage.

However, the decision as the final route selection will be the Master's. The Master will comply with the reporting procedure of the routing service selected by the Charterers.

Evidence of weather conditions shall be taken from the vessel's deck logs and independent Weather Bureau's Reports. In the event of a consistent discrepancy between the Deck Logs and the Independent Weather Bureau's Reports, the Independent Bureau's Reports shall be taken as ruling.

This Clause is only valid if Charterers decide to monitor vessel by a routing company.

Speed and consumption which Owners guarantee vessel will maintain during the whole currency of this Charter Party

- SPEED/CONSUMPTION UNDER GOOD WEATHER CONDITIONS:
ABT 13 KN ON ABT 23 MT IFO 1000" + ABT 2 MT MDO
OR ABT 14 KN ON ABT 26 MT IFO 1000" + ABT 2 MT MDO
- IN NARROW WATERS SUCH AS RIVERS, CANALS, ETC OR WHEN MANOEUVRING

IN PORTS VSL CONSUMES MDO IN THE MAIN ENGINE
- CONSUMPTION AT PORT (IDLE) : ABT 2 MT MDO PER 24HRS
CONSUMPTION AT PORT (WHEN WINCHES ARE WORKING) : ABT 5 MTS MDO PER 24 HRS //
ABT 2 MTS MDO PER 08 HRS

Charterers confirm they will use "Oceanroutes" as independent routing company.

10

*ADDITIONAL CLAUSES OF " 'MV KRISSA' CHARTER PARTY BETWEEN
'PEGASUS DENIZCILIK A.S. ISTANBUL' & 'SHELBY MARINE CORPORATION
PANAMA' PLACE AND DATE: ISTANBUL , 27TH SEPTEMBER 2004 "*

Clause 96

Deleted.

Clause 97

Pre-loading survey to be performed by Owners P and I club surveyor cost of which shall be shared 50/50
between owners and charterers.

Owners privilege to also carry out steel survey at discharging at their cost.

Clause 98

Copy of Charterers' voyage instructions given to the Master shall be passed on to Owners.

Clause 99

Time of delivery / redelivery to be based on GMT but lay canceling to be based on local time.

Clause 100

Deleted.

Clause 101

No padeyes to be welded on hatch covers, in cargo holds and on tanktops.

Clause 102

Vessel to be left in seaworthy trim whenever shifting between berths / anchorages / ports to Master's
satisfaction.

Clause 103

Charterers are not allowed to use more than one crane per hold / hatch and not permitted to work
simultaneously one vessel's crane and one shore crane.

Clause 104

All Bills of Lading to incorporate all terms, conditions, liabilities and exceptions of this Charter Party.

Clause 105

Any extra insurance on cargo, if any, due to vessel's age/class/flag/ownership to be for Charterers' account.

Clause 106

Bunker standards that will be supplied to be as per in vessel's description.

Clause 107

If the disputed amount does not exceed USD 50,000.00 Arbitration to be referred to the Small Claims
Procedures of L.M.A.A.

11

*ADDITIONAL CLAUSES OF " 'MV KRISSA' CHARTER PARTY BETWEEN*
*'PEGASUS DENIZCILIK A.S. ISTANBUL' & 'SHELBY MARINE CORPORATION*
*PANAMA' PLACE AND DATE: ISTANBUL , 27TH SEPTEMBER 2004 "*

Clause 108

- "NYPE Interclub clause" for settlement of cargo claims to apply to this charter-party
- Garbage removal and watchmen If compulsory at any port during this charter-party to be for owners' account
- No through bills of Lading to be issued under this charter-party.
- Re arms clause for calling USA ports, charterers are to remain responsible for compliance with same.

- BIMCO standard ISPS clause to apply to this charter-party which is as flwg:

(a)     (i)     From the date of coming into force of the International Code for the Security     of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).
ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account
(b)     (i) The Charterers shall provide CEC with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to CEC. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:
"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".
(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.
(c)     Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result

solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

- (d)     If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

BIMCO Standard War Risks Clause for Time Charterers, 1993
Code Name: "CONWARTIME 1993"

(1) For the purpose of this Clause, the words:

(a) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

(b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether

12

*ADDITIONAL CLAUSES OF " 'MV KRISSA' CHARTER PARTY BETWEEN 'PEGASUS DENIZCILIK A.S. ISTANBUL' & 'SHELBY MARINE CORPORATION PANAMA' PLACE AND DATE: ISTANBUL . 27TH SEPTEMBER 2004 "*

imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(3) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

(4) (a) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.

(b) If the Underwriters of such insurance should require payment of premiums and/or calls because pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

(5) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

(6) The Vessel shall have liberty:-

(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(b) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(d) to divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

13

ORIGINAL

### ADDITIONAL CLAUSES OF " 'MV KRISSA' CHARTER PARTY BETWEEN 'PEGASUS DENIZCILIK A.S. ISTANBUL' & 'SHELBY MARINE CORPORATION PANAMA' PLACE AND DATE: ISTANBUL , 27TH SEPTEMBER 2004 "

(e) to divert and call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(7) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do

so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(8) If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

### BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following provisions shall apply:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the owners of the said goods and set-off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact."

### NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery."

### GENERAL CLAUSE PARAMOUNT

This Bill of Lading shall have affect subject to the provisions of any legislation relating to the Carriage of Goods by Sea which incorporates the rules relating to Bills of Lading contained in the International convention dated Brussels, 25th August, 1924, and which is compulsorily applicable to the contract of

14

*ADDITIONAL CLAUSES OF " 'MV KRISSA' CHARTER PARTY BETWEEN*
*'PEGASUS DENIZCILIK A.S. ISTANBUL' & 'SHELBY MARINE CORPORATION*
*PANAMA' PLACE AND DATE: ISTANBUL , 27TH SEPTEMBER 2004 "*

carriage herein contained. Such legislation shall be deemed to be incorporated herein, but nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder. If any term of this Bill of Lading be repugnant to any extent to any legislation by this clause incorporated, such term shall be void to that extent, but no further. Nothing in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory protection or exemption from, or limitation of, liability.

### BIMCO Stowaways Clause for Time Charters

(a)    (i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers.

(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account and the Vessel shall remain on hire.

(iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

b)    (i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owners' account and the Vessel shall be off hire.

(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

15

ORIGINAL

*ADDITIONAL CLAUSES OF " 'MV KRISSA' CHARTER PARTY BETWEEN*
*'PEGASUS DENIZCILIK A.S. ISTANBUL' & 'SHELBY MARINE CORPORATION*
*PANAMA' PLACE AND DATE: ISTANBUL , 27TH SEPTEMBER 2004 "*

OWNERS' REPLY TO CHARTERERS' QUESTIONNAIRE:

1) VESSELS NAME: M/V "KRISSA"
2) TYPE OF VESSEL: SELF TRIMMING BULKCARRIER
3) MONTH/YEAR OF BUILD AND WHERE: 8/1979 IN KAOHSIUNG
4) FLAG: PANAMA
5) CLASS: ABS
6) OWS: SHELBY MARINE CORP., PANAMA
   MANAGERS: GOOD FAITH SHIPPING CO. S.A.
7) P+I CLUB: AMERICAN
8) H+M VALUE: USD 5 MILL
9) IMO / L R NO : 7626504
10) CALLSIGN: 3 E X O 4
    TELEX: 435584120 / 435584130
    PHONE: 762883041
    FAX : 762883043
11) MASTERS NAME: CAPT. VOLODIMYR KRYUKOV
12) DWAT ABT 21,000 MT ON ABT 9.97M SDRAFT
13) TPC: ABT 29.9 ON SUMMER DRAFT
14) GT/NT: 12.765/7,140
    SUEZ GRT/NRT: 13,146.14/10,088.23
    PANAMA GRT/NRT: 13,845/10,392
15) LOA/BEAM: 158.80/22.60M
16) CO2 FITTED: YES
17) ELECTRICALLY VENTILATED: YES
18) FW-EVAPORATOR ONBOARD: NO
19) POSITION OF GEAR: TWO PEDESTALS SUPPORTING THE GEAR WORKING AFT
         AND FWD POSITION BETWEEN HOLDS NBR 1 AND 2 AND
         3 AND 4
    MAX OUTREACH:
    DERRICK NO.1 ABT 5.6M
    DERRICKS NOS. 2,3,4 ABT 6.5M

20) HATCH DIMENSIONS: 16.8-18.4-18.4-18.4 M ALL BY 11.20 M
21) TYPE OF HATCHCOVERS: FOLDING MACGREGOR TYPE HATCHCOVERS
22) HOLDS DIMENSIONS (ALL 'ABOUT', ALL IN METERS)

| | LENGTH | WIDTH |
|---|---|---|
| NO.1 | 25.5 | 4.8/16 |
| NO.2 | 27 | 16 |
| NO.3 | 27 | 16 |
| NO.4 | 27 | 16/9.9 |

(ABV LENGTHS AND WIDTHS AT TANK TOP)
23) HOLD CAPACITIES
    GRAIN CUBICS BREAKDOWN (IN CUBIC FEET)

| | |
|---|---|
| NO.1 HO | 185,824.80 |
| NO.2 HO | 232,761.20 |
| NO.3 HO | 232,771.80 |
| NO.4 HO | 227,534.70 |
| TOTAL | 878,892.50 |

16

ORIGINAL

*ADDITIONAL CLAUSES OF " 'MV KRISSA' CHARTER PARTY BETWEEN*
*'PEGASUS DENIZCILIK A.S. ISTANBUL' & 'SHELBY MARINE CORPORATION*
*PANAMA' PLACE AND DATE: ISTANBUL , 27TH SEPTEMBER 2004 "*

BALE CUBICS BREAKDOWN (IN CUBIC FEET)

NO.1 HOLD    170,371.40
   HATCH BOX  5,345.60
   ---------
   TOTAL    175,717.00

NO.2 HOLD    207,590.20
   HATCH BOX  5,854.80
   ---------
   TOTAL    213,445.00

NO.3 HOLD    207,590.20
   HATCH BOX  5,854.80
   ---------
   TOTAL    213,445.00

NO.4 HOLD    204,803.90
   HATCH BOX  5,854.80
   ---------
   TOTAL    210,658.70

   ---------

GRAND TOTAL  813,265.70

24) STRENGTHS: HOLDS TANK TOP  11   TNS/M2
      DECK/HATCHES  2.2-2.7 TNS/M2
25) STEELFLOORED TANKTOPS: YES
26) PORT CONSUMPTION: ABT 2 TNS MDO PER 24 HRS WHEN IDLE
      ABT 2 TNS MDO PER 8 HRS WHEN GEAR WORKING
27) BUNKERTANK CAPACITIES: ABT 1000 MT IFO / ABT 150 MT MDO
28) CONSTANTS: ABT 400 MT EXCL FRESH WATER
   FRESHWATER: ABT 350 MT
29) TEU CAPACITIES: N/A
30) DEPTH MOULDED: 13.3 M
31) ALTERNATE HOLDS LOADING: NO
32) VSL HAS ON W/DECK ALL NECESSARY CONTAINER SUPPORTS HEIGHT 1.86M
   FROM H/COAMING TO S/P SIDE AND DECK HOUSE STRUCTURES AS WELL AS
   ALL NECESSARY EQUIPMENT FOR PLACING/SECURING CONTAINERS
33) HOLDSPACE FREE OF ANY OBSTACLES:
   VSL HAS FLAT CONT SHOES/HOPPER IN HOLDS AND WING TANKS
   SIDES OF HOLDS ARE WITH WELDED STEEL BATTENS
34) SPEED/CONSUMPTION UNDER GOOD WEATHER CONDITIONS:
   ABT 13 KN ON ABT 23 TNS OR ABT 14 KN ON ABT 26 TNS IFO 1000" +
   ALWAYS ABT 2 TNS MDO
35) ITF-FITTED OR OTHER BONAFIDE TRADE UNION AGREEMENT
36) ICECLASS: NO
37) LAST 3 CARGOES/VOAYAGES/CHARTERERS:
38) ARE THERE ANY LIMITATIONS FOR LOADING OF HEAVY COILS IN VESSEL'S
   LOADING MANUAL: THE LIMITATION IS IN CONNECTION WITH TANK TOP
   STRENGTH WHICH CANNOT BE EXCEEDED

-  ALL DETAILS 'ABOUT' AND AS PER PLANS .

17

# EXHIBIT B

```
Memo-MSG.: 26264        Date: Thu 22/Dec/2005 15:00
From: KANDARAKIS IDOMENEAS
To: DIAMANTI MARGARITA//GOODFAITH
Subject:



to:NICHOLAS G MOUNDREAS SHIPPING SA PIRAEUS
from:GOOD FAITH SHIPPING CO SA


PLS PASS FOLL  CHARTERERS:

Q U O T E

REF: MV KRISSA / PEGASUS - 27/9/05

GD DAY,

PLS KINDLY NOTE TT REF VSL'S  REDELIVERY DATE IS ON
21/1/05 AT DLOSP HOUSTON 0420 GMT,OR 20/1 2220 LT WITH BOR F0752.649MT AND DO 52.944 AND IN THIS RESPEC
 FINAL HIRE
STATEMENT STANDS AS FOLL:

PERIOD:
FM   24/10/04 0345 GMT
TILL 21/1/05 0420 GMT
```

|  | DEBIT USD | CREDIT USD |
|---|---|---|
| HIRE 89D35M OR 89.0243075 |  |  |
| X USD 12,000.00 | 1,068,291.69 |  |
| LESS PCT3.75 COMM |  | 40,060.93 |
| CVE | 3,264.22 |  |
| ILOCH | 5,000.00 |  |
|  |  |  |
| BUNKER ON DELIVERY |  |  |
| IFO 717.230 MT X USD 200.00 | 143,446.00 |  |
| MDO  60.90  MT X USD 350.00 | 21,315.00 |  |
|  |  |  |
| BUNKER ON REDELIVERY |  |  |
| IFO 752.649 MT X USD 200.00 |  | 150,529.80 |
| DO   52.944 MT X USD 350.00 |  | 18,530.40 |
| GANG S/B COST ONLY APPROVED |  | 8,663.71 |
|  |  |  |
| PAID TO OWNS |  |  |
| USD 336,245.50 |  | 943,449.28 |
| USD 173,765.00 |  |  |
| USD 354,596.09 |  |  |
| 'SD  72,688.43 |  |  |
| USD 139,095.62 |  |  |
| USD  41,517.38 |  |  |
| USD  23,541.18 |  |  |

```
                      --------------------------
                      1,241,316.91   1,161,234.04
DUE TO OWNS                            80,082.87

PLS  ADVISE TT USD 80,082.87 WILL BE REMITTED TO OWNS ACCNT
WITHIN TODAY.

BEST REGARDS
OPS
U N Q U O T E

TKS/RGDS
OPS--
```